**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| **v.** | ) | |
| | ) | **NO. 1:14-CR-218-ODE-AJB** |
| **RICKY NUCKLES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**UNITED STATES MAGISTRATE JUDGE'S
<u>FINAL REPORT AND RECOMMENDATION</u>**

This case is pending before the undersigned Magistrate Judge on Defendant Ricky Nuckles's motion to suppress evidence and statements. [Doc. 16]. The Court held two evidentiary hearings, [Doc. 22 (hereinafter "T1:__"); Doc. 26 (hereinafter "T2:__")], after which the parties filed briefs, [Docs. 27 (United States), 29 (Nuckles)].[1] For the following reasons, the undersigned **RECOMMENDS** that the motion to suppress, [Doc. 16], be **DENIED**.

***Introduction***

Nuckles is charged in a two-count indictment with possession with intent to distribute more than five kilograms of cocaine and possession of a firearm in furtherance of that offense. [Doc. 1]. He moves to suppress the search of a vehicle and

---

[1]    The government did not file a reply. [*See* Dkt.].

a suitcase contained therein and challenges the admissibility and voluntariness of statements he made in an encounter with law enforcement on December 23, 2013.  [Doc. 16].

### Facts

As of the time of the initial evidentiary hearing on August 6, 2014, Michael Connolly had been a Drug Enforcement Administration ("DEA") Special Agent for five years, and before becoming a DEA agent, he spent almost six years as a Massachusetts police officer.  T1:5.  During his law-enforcement career, he had been involved in approximately fifty drug investigations.  *Id.*  He testified that, based on his experience, he was able to recognize drug transactions, ranging from hand-to-hand exchanges of small quantities of drugs on the street to larger transactions commonly involving exchanges between separate vehicles in locations such as gas stations and big-box store parking lots.  T1:6, 37.  He usually investigated the larger transactions. T1:37.

On December 23, 2013, at about 10:00 a.m., Connolly was off duty and went to the Valero gas station on Cheshire Bridge Road in Atlanta to have his annual emissions

2

inspection performed.  T1:7, 10, 15.[2]  The location is near his residence.  T1:35.  He was dressed in jeans and a North Face jacket.  His weapon was secreted in an ankle holster.  T1:8.

When he arrived at the emission-inspection station, there was another car ahead of his, so Connolly waited and cleaned out the trash from his car.  T1:7-8.  He noticed a black Ford Taurus with a red dealer tag parked at the gas pumps, but gasoline was not being pumped into it.  T1:8, 10, 36.[3]  Connolly was unaware whether gasoline already had been pumped into the Taurus or the driver had gone inside the store to pay for gasoline.  T37.[4]  Then, at approximately 10:05 a.m. (VSV 10:07:21), Connolly saw a

---

[2]      Due to its proximity to I-85, Connolly described the area as a high drug-trafficking area.  T1:7.

[3]      At some point after the incident recounted in the text, law enforcement retrieved a copy of a video from the security camera at the Valero gas station.  T1:17; Gov't Ex. 1.  The video contains no audio.  According to the time-stamp on Valero security video (hereinafter "VSV"), the Taurus arrived at 10:05:28 a.m. and parked at the gas pump furthest from Cheshire Bridge Road but closest to the adjacent convenience store entrance.  VSV 10:05:29.  The driver of the Taurus exited the vehicle and entered the store.  VSV 10:05:45-52.  The Court notes the security video in this instance merely to give context to the events described in the text.  The Court relies upon citations to the security video in this R&R only to the extent that they confirm (or contradict)  Connolly's testimony about his encounter with Nuckles.

[4]      The Valero security camera shows that Nuckles did not put gas in the Taurus.  *See generally* VSV.  However, since Connolly did not know this, this fact does not figure into the Fourth Amendment analysis that the undersigned performs *infra*.

3

second car (also a dark sedan) pull in and stop at the opposite side of the gas pumps. T1:8, 38.  The trunk of the second vehicle opened as the driver exited the vehicle. VSV 10:07:31.  A black male got out of the second car, but instead of pumping gas, he opened the trunk of his vehicle and removed a large suitcase.  T1:8, 10, 38.[5]  Connolly described the size of the suitcase as one that could not be carried onto an airplane, but would have to be checked.  T1:8.  The male from the second car carried the suitcase over to the trunk of the Taurus.  He attempted to open the trunk of the Taurus, but it would not open.  T1:8-9; VSV 10:07:54.  He then looked up at the convenience store attached to the gas station, which Connolly interpreted as looking for someone in the store that he knew.  T1:9.

As Connolly walked towards the Taurus on his way to the trash bin next to the store, he saw the male from the second car open the Taurus's driver's side back door and place the suitcase inside the Taurus.  T1:9, 44; VSV 10:08:02.  As Connolly was disposing of the trash, he saw Defendant Nuckles standing inside the convenience store, looking out of the glass window.  T1:9, 56.  Connolly walked back to his vehicle from the trash bin and saw the male from the second vehicle close the door to the Taurus, re-

---

[5]       Connolly did not take any photographs of the second vehicle or the person who arrived in it.  T1:28.  He saw the license plate, but was unable to write it down and forgot it due to the events that followed immediately thereafter.  T1:56.

4

enter the second vehicle, and drive away.  T1:11, 44; VSV 10:08:13.  The second car had been at the gas station for less than one minute.  T1:60.  After the male from the second car walked back to his car after depositing the suitcase in the Taurus, Connolly saw the Taurus's lights blink as if the doors were being locked, but no one was near the Taurus at that time.  T1:11; VSV 10:08:19.  At the time the Taurus's brake lights flashed, Connolly was walking away from the Taurus and was approximately more than a car length behind it.  VSV 10:08:19.

Connolly called his partner and told him to send some people to his location because he thought "there's something going on here."  T1:11.  Connolly testified that his observations were "exactly consistent with the type of drug transactions that I see on a weekly basis."  T1:11.

While Connolly was on the phone with his partner, he saw Nuckles exit the convenience store and walk towards the driver's door of the Taurus.  T1:12, 44; VSV 10:09:37.[6]  Connolly approached him and took out his DEA badge and displayed

---

[6]      It appears from the security video that Nuckles remotely unlocked the Taurus because the brake lights illuminated.  VSV 10:09:39.

5

it to Nuckles.   VSV 10:09:47.[7]   He identified himself as a DEA agent and asked Nuckles if he could speak with him for a minute.   Nuckles said yes.   T1:12.

Connolly asked him if the Taurus was his and Nuckles replied that it was.  T1:12. Connolly asked him about the dealer tag and Nuckles explained that he owned a dealership and told Connolly his name and the name of his dealership.   T1:12, 59. When Connolly explained that he had just observed a random male put a suitcase in his car, Nuckles became "extremely nervous," in that he looked "in all directions," his hands were moving around, and "basically he couldn't stand in place."   T1:12-13; VSV 10:10:08.

Connolly described Nuckles as about forty years old.   He appeared to be educated in that he understood what questions he was asked and spoke "fine."  T1:13. He was wearing a big winter work jacket.  T1:14.  Nuckles began to walk away and Connolly asked him if he minded "just hanging out here for a little bit so we can talk,"

---

[7]     Connolly did not physically block Nuckles's attempt to enter the Taurus. The security video shows that the Taurus was parked with the driver's side closest to the gas pumps and the passenger side facing the convenience store.   Nuckles approached the Taurus from the front passenger side, and walked in front of the vehicle to approach the driver's door.  Connolly approached the vehicle from the driver's side rear of the Taurus.   Nuckles walked past the Taurus on the driver's side (while Connolly still was more than a car length away from the rear of the Taurus), and met Connolly, who had stopped approximately half a car length behind the Taurus. VSV 10:09:47.

6

but Nuckles continued to walk away and into the gas station.  T1:13; VSV 10:10:13-30.

Connolly did not attempt to stop him.  T1:13.

Connolly continued to watch Nuckles, who appeared to be buying lottery tickets

inside the store.  T1:14.[8]  When Nuckles exited the store a little over a minute later

(VSV 10:11:43), Connolly re-engaged him by asking if he had any weapons on him,

and Nuckles replied that he did not.  T1:14.  Connolly asked if he could do a quick pat

down to make sure he was unarmed, and Nuckles responded that he could and raised

his arms.  T1:15; VSV 10:11:56-10:12:05.  Connolly did not find any weapons during

the pat-down.  T1:15.

Connolly and Nuckles walked toward the Taurus, with about three to four feet

between them.  *Id.*; VSV 10:12:07.  There were other gas-station patrons pumping gas.

*Id.*; *see also* VSV 10:13:32 (showing vehicles at all gas pumps and other patrons inside

and outside of their vehicles).  Connolly again explained what he had seen, and Nuckles

stated that he was inside the gas station, stated that the bag was not his, and repeated

that he was in the gas station.  Connolly acknowledged that Nuckles had been inside

---

[8]      There was another door on the opposite side of the gas station convenience
store.  T1:54.

7

the convenience store and tried to "keep the situation at a lower point" because Nuckles "was starting to get elevated towards me." T1:15-16; *see also* VSV 10:12:30-10:13:24.

Connolly asked Nuckles, "Would you mind if I searched your car to see what's in the suitcase?" and Nuckles replied, "No, I don't care. Go ahead. I told you it's not mine." T1:16; *see also* T1:34.[9] At this point, Connolly received a telephone call from one of his DEA group members, who advised that additional officers were on their way. *Id.*

After Connolly ended the phone call, Nuckles asked him if he could retrieve something from his vehicle. Connolly asked him if he had any weapons in the vehicle, and Nuckles stated that he did. Connolly asked him if he minded waiting until Connolly's assistance arrived, and Connolly described Nuckles as being "fine with that." *Id.* Connolly then called 911 because he did not know when members of his group would arrive. He told the 911 dispatcher who and where he was, and explained that he was with a person with a firearm in his vehicle. T1:18. The 911 dispatcher asked Connolly for a description of the armed man. *Id.* While Connolly was on the phone, Nuckles put his hands in his pockets, and when Connolly finished the call, he

---

[9]     At no time was Nuckles given a written consent-to-search form to review. T1:48-49.

asked Nuckles to take his hands out of his pockets.  *Id.*; *see also* VSV 10:14:04-10:14:29 (showing Connolly on phone and Nuckles walking around with hands in his pockets); 10:16:02 (Nuckles appearing to gesture with hands and arms raised as if displaying that his hands were empty).  Connolly also asked Nuckles if he would walk over toward the gas station (away from the Taurus), and Nuckles complied.  T1:19; VSV 10:15:09-11.  Nuckles sat on the curb; Connolly testified that he did not ask him to sit.  T1:19, 65; VSV 10:16:14-19.[10]  The video shows Connolly motioning to Nuckles with his hands as if to tell him to sit down on the curb, VSV 10:16:08-14, but the movement is inconclusive to the Court (and in any event, does not affect the Court's analysis).

Three to four minutes after the 911 call ended, Sandy Springs Police Department Detectives Jeff Byrd and Lerod Freeman—both of whom were DEA Task Force members—arrived at the Valero in a police car that was unmarked but that was flashing

---

[10]     Connolly also testified that he was familiar with Nuckles's name because he had debriefed a cooperating defendant who identified Nuckles as an Atlanta drug trafficker.  T1:32.  The Court does not rely upon this testimony in concluding that reasonable suspicion existed to authorize Nuckles's detention, to the extent that Nuckles was detained prior to being asked for consent to search the suitcase and vehicle.  In any event, the record is unclear when Connolly learned Nuckles's name to reference it to the earlier debriefing.  *See* T1:58 (Connolly testifying that he did not know Nuckles until he told him his name); T1:60 (Connolly testifying that it dawned on him that he was familiar with Nuckles as they continued to talk).

9

the blue lights embedded in the vehicle's front grill.  T1:19, 64-65; VSV 10:18:06.

They walked over and joined Connolly and Nuckles, who was now standing.  T1:65;

VSV 10:18:23.  Nuckles appeared to be agitated and irritated at the situation.  T1:66.

During the encounter with Nuckles, no law-enforcement agent unholstered his weapon.

T1:50, 51.  Freeman frisked Nuckles.  VSV 10:18:40.

Connolly asked Nuckles for the keys to the Taurus because it still was locked.

T1:18, 60.  Nuckles removed the keys from his pocket and gave them to Connolly,

who again asked if he had an issue with searching the car to see what was in the

suitcase. T1:18-19.[11]  Nuckles again stated that he did not mind and that it was not his

suitcase.  T1:19, 66.[12]  Freeman frisked Nuckles again.  *Id.*; VSV 10:19:02.

_____

[11]     The Valero security video does not show Nuckles handing the keys to
Connolly, VSV 10:18:26-34, although it does show Nuckles appearing to fish the keys
out of his pocket.  Whether due to the quality of the recording equipment, the lighting
at the gas station, or the fact that the copy of the video submitted as an exhibit is
actually a video recording of the security footage being played on a computer screen,
some of the video is not sharp.  *See, e.g.,* VSV 10:18:34.

The Court's review of the video demonstrates that Nuckles remotely unlocked
the Taurus because, again, the brake lights illuminated.  VSV 10:18:29.  Also, it looks
like Nuckles popped the trunk of the Taurus as he was being re-frisked by Freeman.
VSV 10:18:42-44.  A few moments later, when Connolly discovered that the suitcase
was locked, the video appears to show Connolly re-approaching Nuckles, who then
gave his keys to Connolly, who looked at them to see if there was key to the suitcase
lock.  VSV 10:19:40-45.

[12]     On cross-examination, Nuckles pointed out that Connolly did not include
Nuckles's ownership denial in his DEA-6 report.  T1:47.  The Court credits Connolly's

Connolly entered the Taurus and retrieved the suitcase, placing it on the ground behind the Taurus.  T1:20; VSV 10:19:11.  Other law-enforcement agents, including uniformed Atlanta police officers—in two police vehicles—and DEA Task Force Officer Chris Richards, arrived on the scene.  T1:19, 48; VSV 10:19:11, 10:19:23.  The suitcase had a lock on it, and although Nuckles had a key ring with many keys on it, Connolly and Richards popped the lock with a screwdriver and observed what they believed were twenty-four kilograms of cocaine.   T1:21, 22;  VSV 10:20:52; Gov't Ex. 4.  The suspected drugs field-tested positive for cocaine.  T1:23.

Connolly advised Nuckles that he was under arrest and handcuffed him, and Nuckles immediately asked to speak with a lawyer.  T1:23, 69; T2:9; VSV 10:20:58. Nuckles was not questioned.  T1:23.

Byrd entered and seized a FN Five-seveN handgun and an ammunition clip from the Taurus's driver's side door pocket and two cell phones from the center console. T1:46, 61, 68.[13, 14, 15, 16]

---

testimony.

[13]   The cell phone that Connolly had observed on Nuckles earlier in the encounter was not located on him when he was searched following his formal arrest. T1:62.

[14]   An amount of currency also was seized from Nuckles after his arrest.  T1:68-69; Gov't Ex. 6.  The indictment seeks forfeiture of $6,001.00 in

The time period between Connolly's first encounter with Nuckles and Nuckles's formal arrest was approximately twelve minutes.

The wholesale value of the cocaine in the suitcase is approximately $750,000. T1:6-7.

### Contentions of the Parties

The government argues that Connolly's observations gave him reasonable suspicion to perform a brief investigatory detention of Nuckles pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and the totality of the circumstances gave Connolly the authority to detain him only long enough as necessary to confirm (or dispel) his

---

U.S. Currency, [Doc. 1 at 2], but there was no testimony at the hearing as to how much currency was seized from Nuckles upon his arrest.

15       The vehicle was forfeited. T2:10.

16       The government asserted that these cell phones were not searched, and thus no evidence was seized from them that the government will introduce at trial. [Doc. 27 at 3 n.2]. The government also contends that a subsequent review of the in-store video showed that Nuckles discarded into the trash another cell phone that apparently was on his person. [*Id.*]. Because this information was not known by law enforcement at the time of the events described in the text, it is not relevant to the issue before the Court, and the Court disregards it in its analysis. *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000) ("In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention.") (citing *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996); *United States v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989)).

12

reasonable suspicions. [Doc. 27 at 8-9]. It argues that Connolly suspected that Nuckles was involved in a drug deal—a legitimate reason to detain him—and contends that during the conversation with Connolly, Nuckles denied knowing about the suitcase, while Connolly waited for backup so that he could determine what was in the suitcase. [*Id.* at 9]. It also argues that law enforcement acted diligently and that any delays were for officer safety, since Connolly could not search the vehicle by himself, especially since Nuckles stated that a firearm was in the vehicle. [*Id.* at 10]. Once backup arrived, Connolly immediately searched the vehicle and found the cocaine. [*Id.*].

The government also argues that the scope and intrusiveness of the detention were reasonable and did not transform the limited detention into an arrest. It points out that Nuckles was in a very public area, no officer drew a weapon, he was not threatened, ordered to the ground or placed in a police vehicle, nor was he restrained, handcuffed, or presented with a show of force. [*Id.* at 10]. It notes that he was free to wander in and out of the store (which had another exit) and that there was no mention of an arrest before the cocaine was found. [*Id.*]. It also notes that the entire encounter was brief, a total of eighteen minutes. [*Id.*].

13

The government next argues that Nuckles was not in custody prior to his formal arrest, and thus, he was not entitled to any *Miranda* warnings during the detention or suppression of his statements. [*Id.* at 11-13]. It also argues that his statements were voluntarily made. [*Id.* at 13].

The government next argues that Nuckles voluntarily consented to the search of the Taurus as well as the suitcase. [*Id.* at 14-16].

The government also contends that Nuckles did not have standing to challenge the search of the suitcase, and that even if he did, he abandoned it by claiming that the suitcase was not his and that he had no knowledge of it. [*Id.* at 16]. In any event, it argues that he gave a general consent to search and that breaking the lock on the suitcase was therefore within the scope of the consent given. [*Id.* at 18-19]. Finally, the government argues that even if Nuckles did not consent to the search of the vehicle, the search subsequent to his arrest was valid. [*Id.* at 20-23].

In response, Nuckles argues that he has standing to challenge the search of the vehicle and its contents. [Doc. 29 at 2]. He contends that he exercised ownership and control over the vehicle when he confirmed to Connolly that the vehicle was his and remotely locked the vehicle. [*Id.*]. He also contends that the only fact in support of abandonment cited by the government was "a few words" he allegedly stated when

14

questioned by Connolly which, he argues, is insufficient to satisfy the government's burden to show abandonment.  [*Id.*].

Nuckles next argues that he was subjected to an unreasonable and prolonged detention.  He contends that Connolly seeing a person put a suitcase in another person's car in broad daylight is insufficient to justify a *Terry* detention.  [*Id.*].  Even if there was justification for the stop, Nuckles argues that the scope and duration of the detention exceeded *Terry*'s permissible limits.  In support, he argues that Connolly prevented him from re-entering his vehicle and acted as a barrier to prevent him from leaving the gas station.  Nuckles argues that he was cooperative and answered all of Connolly's questions, and thus the detention should have terminated and he should have been allowed to leave.  [*Id.* at 4].  He further submits that his statements disavowing knowledge of the suitcase should dispel rather than add to any level of suspicion.  [*Id.*].  Nuckles also disputes the government's argument that he was allowed to freely wander the gas-station premises; instead, he argues, Connolly followed him towards the gas station and "threateningly stood right outside the of the door, at one point gesturing for him to come back outside when he thought the defendant had been in the store for too long."  [*Id.*].  He also alleges that he tried to break off the encounter but was further detained, and he argues that he was not free to leave, nor would a reasonable person in

15

his situation felt free to leave.  [*Id.* at 4-5].  He also argues that the video shows that Connolly ordered him out of the gas station by holding the door open for him as he exited the store.  [*Id.*].  He then argues that the ensuing pat-down (resulting in no weapons being found) and ordering Nuckles to stay and sit on the curb unreasonably prolonged the detention.  He also claims that the totality of the circumstances effectively transformed the encounter into an unlawful custodial arrest.  [*Id.* at 5].

As to consent, he argues that even if he initially consented (which he does not concede), the second time he was asked, he was surrounded by armed police officers, one of whom had just frisked him.  [*Id.* at 5-6].  He also points out that he was not told he had a right to refuse to consent, and he argues that he did not reasonably believe he could refuse because he had previously attempted to enter his vehicle and leave but was stopped and because he had asked to enter his vehicle and was refused.  [*Id.* at 6].

Finally, he argues that even if he voluntarily consented, the search exceeded the scope of that consent.  He acknowledges that consent freely given can include locked containers, [*id.* at 7 (citing *United States v. Martinez*, 949 F.2d 1117 (11th Cir. 1992)], but he argues that it was unreasonable to break the lock and rip open the suitcase without asking him, [*id.*].

16

*Discussion*

The parties' filings raise the following issues: (1) whether Connolly had reasonable suspicion to detain Nuckles and, if so, did the encounter ripen into a *de facto* arrest which required probable cause; (2) whether Nuckles's statements were voluntary and in compliance with *Miranda*; (3) whether Nuckles abandoned the suitcase and thus had no "standing" to challenge its search; (4) whether Nuckles voluntarily consented to a search of the vehicle and suitcase, and whether the scope of the consent included breaking the lock on the suitcase; and (5) whether the firearm and magazine were properly seized from the vehicle.  The Court addresses each in turn.

> **1.    *The Connolly-Nuckles encounter initially was consensual but became a seizure supported by reasonable suspicion, and the detention did not ripen into a* de facto *arrest requiring probable cause until Nuckles was formally arrested***

> **a.    Applicable law**

There are three categories of police-citizen encounters contemplated within the Fourth Amendment: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests.  *United States v. Cusick*, 559 Fed. Appx. 790, 791 (11th Cir. Feb. 24, 2014) (citing *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989)).  Interactions falling within the first

17

category—consensual encounters—are not subject to Fourth Amendment scrutiny. *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006). The Supreme Court has stated that "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen" and that "[i]f a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *United States v. Drayton*, 536 U.S. 194, 200-01 (2002); *Miller v. Harget*, 458 F.3d 1251, 1257 (11th Cir. 2006) (stating that "[o]fficers are free, without any level of suspicion, to approach citizens on the street or in a public place . . . ."). "This test 'is objective and presupposes an *innocent* person.' " *United States v. Ramirez*, 476 F.3d 1231, 1238 (11th Cir. 2007) (quoting *Drayton*, 536 U.S. at 201-02 (citation and internal quotation omitted)) (emphasis in original). Thus, the simple act of police questioning does not constitute a seizure. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Perez*, 443 F.3d at 778. An officer can even ask for consent to search without transforming a consensual encounter into a seizure, as long as the officer does not use coercive means or convey a message that compliance with the request is required. *Bostick*, 501 U.S. at 435. Factors used to determine whether a reasonable person would feel free to leave include, among other things,

18

"whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education, and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect; and tone of voice of police." *United States v. Chrispin*, 181 Fed. Appx. 935, 938 (11th Cir. May 26, 2006) (quoting *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991)).

As to the second category, law-enforcement officers may briefly detain a person for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged, or is about to engage, in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000). Reasonable suspicion requires "more than a hunch"; it requires that the totality of the circumstances create, at least, "some minimal level of objective justification" for the belief that the person engaged in unlawful conduct. *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220-21 (11th Cir. 1993) (citation omitted). A determination of reasonable suspicion based on the totality of the circumstances may be formed even if the conduct is ambiguous or can be given an innocent explanation. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *Powell*, 222 F.3d at 917-18. " 'The reasonableness of the officers' conduct must be judged against an objective standard:

19

would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate.' " *United States v. Lara-Mondragon*, 516 Fed. Appx. 771, 774 (11th Cir. Apr. 9, 2013) (quoting *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) (internal quotation marks omitted)).  Officers may draw on their experience and specialized training to make inferences and deductions from the available information, but the information on which they rely must be reliable in its assertion of illegality and should be corroborated by independent police work.  *United States v. Ochoa*, 402 Fed. Appx. 478, 482 (11th Cir. Nov. 9, 2010) (citing *United States v. Lindsey*, 482 F.3d 1285, 1290-91 (11th Cir. 2007)); *see also United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000).  In examining the totality of the circumstances to decide whether detaining officers had "reasonable suspicion" of criminal activity of the kind required to support an investigative stop, the Court must view the totality of the circumstances in light of the officers' special training and experience and must bear in mind that behavior, seemingly innocuous to the ordinary citizen, may appear suspect to one familiar with practices of narcotics couriers.  *Id.* (quoting *United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992)).

In connection with a *Terry* stop, a police officer who has reason to believe that he is dealing with an armed and dangerous individual may also conduct a reasonable search for weapons in support of his own protection and that of others, even if he is not absolutely certain that the individual is armed. *Terry*, 392 U.S. at 27; *see also Arizona v. Johnson*, 555 U.S. 323, 332 (2009) (holding that "officers who conduct 'routine traffic stop[s]' may 'perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous' ") (quoting *Knowles v. Iowa*, 525 U.S. 113, 117-18 (1998)); *United States v. Montague*, 437 Fed. Appx. 833, 835 (11th Cir. Aug. 15, 2011). An officer may conduct a *Terry* pat-down search for weapons on a suspect's person if the requisite reasonable suspicion is present, and that search may continue when an officer feels a concealed object that he reasonably believes may be a weapon. *United States v. Clay*, 483 F.3d 739, 743-44 (11th Cir. 2007); *see also Michigan v. Long*, 463 U.S. 1032, 1047 (1983) (holding that, in the context of a *Terry* stop, "[w]hen the officer has a reasonable belief that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine

21

whether the person is in fact carrying a weapon and to neutralize the threat of physical harm") (internal quotations omitted).

With regard to *Terry* detentions, "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  The Supreme Court has indicated that the proper inquiry is whether, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Id.* at 554; *United States v. House*, 684 F.3d 1173, 1199 (11th Cir. 2012).  The  Court has further explained that "the reasonable person standard presupposes an *innocent* person." *Bostick*, 501 U.S. at 438 (emphasis in original).

A seizure by means of a show of authority requires both a show of authority and submission to that authority.  *California v. Hodari D.*, 499 U.S. 621, 628-29 (1991). That is, a government officer effects a seizure by means of a show of authority where " 'the officer's words and actions would have conveyed . . . to a reasonable person' " that "he was being ordered to restrict his movement," and those words and actions actually "produce his stop."  *Id.*  Certain "circumstances . . . might indicate a seizure, even where the person did not attempt to leave," including "the display of a weapon by

22

an officer . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.

"In *Terry*, the Supreme Court adopted a dual inquiry for evaluating the reasonableness of an investigative stop." *United States v. Acosta*, 363 F.3d 1141, 1144 (11th Cir. 2004) (internal quotation marks omitted). First, the courts examine whether the police action was justified at its inception. *Id.* Second, the courts consider whether the stop was "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 1145 (internal quotation marks omitted). To determine whether the manner and length of an investigatory detention during a *Terry* stop was reasonable under the second prong, four non-exclusive factors are weighed. *Id.* at 1146. The factors are: (1) the purpose of the detention; (2) the diligence of the police in conducting the investigation, i.e., "whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant," *id.* at 1147; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention. *Id*. at 1146. "There is no rigid time limitation or bright line rule regarding the permissible duration of a *Terry* stop," *id.* at 1147, but detentions of less than one hour have been repeatedly upheld as reasonable. *See, e.g., United States v. Sharpe*, 470 U.S. 675, 688 (1985)

23

(finding twenty minutes to be reasonable); *Courson v. McMillian*, 939 F.2d 1479, 1492 (11th Cir. 1991) (finding thirty minutes to be reasonable); *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988) (finding fifty minutes to be reasonable). Of course, "[o]nce a *Terry* stop exceeds its carefully circumscribed limits, the police must observe the probable cause requirement." *United States v. Mosquera-Ramirez*, 729 F.2d 1352, 1356 (11th Cir. 1984).

As to the third category, "when the totality of circumstances indicate that an encounter has become too intrusive to be classified as a brief seizure, the encounter is an arrest and probable cause is required." *Perez*, 443 F.3d at 777 (quoting *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1506 (11th Cir. 1986) (citation omitted)). " 'Whether or not an arrest has occurred depends on the particular facts involved in an incident. No formal words are required stating that an individual is under arrest and it is not necessary that a formal arrest record be filed.' " *United States v. Vasquez-Ortiz*, 344 Fed. Appx. 551, 553 (11th Cir. Sept. 16, 2009) (quoting *United States v. Ashcroft*, 607 F.2d 1167, 1170 (5th Cir.1979) (citation omitted)). The Eleventh Circuit has recognized a non-exclusive list of factors that may indicate an arrest: "the blocking of an individual's path or the impeding of his progress; the display of weapons; the number of officers present and their demeanor; the length of the

24

detention; and the extent to which the officers physically restrained the individual."
*Hastamorir*, 881 F.2d at 1556.

### b.   Analysis

Applying these principles, the Court concludes that up until Connolly initially frisked Nuckles, the encounter was consensual and no level of suspicion was required. *See United States v. Davis*, 202 F.3d 1060, 1062 (8th Cir. 2000) ("*Terry* leaves no doubt that a pat-down search is a seizure."); *cf. Florida v. J.L.*, 529 U.S. 266, 272-73 (2000) (officers must have reasonable suspicion before conducting a *Terry* stop and frisk even when an officer has a hunch that a person may be armed). Up until the initial frisk, all Connolly did was approach Nuckles and ask him questions, which does not constitute a seizure. *Bostick*, 501 U.S. at 434. After this initial encounter/questioning, Nuckles began to walk away, and although Connolly asked him to stay, Nuckles continued to walk toward and enter the convenience store. Because Nuckles did not acquiesce to Connolly's request, Nuckles was not seized at that time. *Hodari D.*, 499 U.S. at 626 (holding that a defendant who does not comply with officer's direction to halt is not seized); *United States  v. McClendon*, 713 F.3d 1211, 1216 (9th Cir. 2013) (no seizure where defendant did not comply with police order to stop and instead walked away). *Cf. Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160, 1167 (11th Cir. 2005) (noting that

officer's attempt to seize the suspect "by firing at the tire of the Oldsmobile was not a seizure.  '[N]either usage nor common-law tradition makes an attempted seizure a seizure.'  " (alterations and emphasis in original) (quoting *Hodari D.*, 499 U.S. at 626 n.2)); *see also United States v. Scheetz*, 293 F.3d 175, 183 (4th Cir. 2002) (defendant not seized when he ignored officer's directive and fled).

The Court disagrees with Nuckles's argument that he was seized because Connolly prevented him from entering his vehicle initially and then ordered him out of the convenience store and held the door open.  First, the undisputed evidence is that Connolly merely approached Nuckles, identified himself as a DEA agent and asked to speak with him.  In approaching Nuckles, Connolly did not physically block Nuckles's entry into the Taurus, but rather asked to speak from him from a distance and without placing himself between Nuckles and the Taurus.  VSV 10:09:47.  Further, there is no evidence that Connolly ordered Nuckles not to enter the Taurus.  Second, there is simply no evidence that Connolly did anything more than watch Nuckles while he was in the convenience store and wait until Nuckles began to come out of the store.  That he opened the door for Nuckles as Nuckles exited the store is not a seizure.

Thus, no seizure under the Fourth Amendment occurred until after Connolly asked Nuckles upon his exit from the convenience store if he could pat him down, after

26

first asking whether he had any weapons.  However, the seizure was supported by

reasonable suspicion.  By this time, Connolly had observed the second vehicle driver

arrive, attempt to place a large suitcase in the Taurus's trunk, place it in the Taurus's

back seat, and immediately drive away without making contact with anyone associated

with the Taurus.  To Connolly, these observations were consistent with large-quantity

drug transfers, and the events occurred in an area known for drug trafficking.  The

suitcase was large enough to contain either a substantial amount of drugs or currency,

such that it would be unreasonable to have left the suitcase with an unwitting

accomplice.  *Cf. United States v. Quilca-Carpio*, 118 F.3d 719, 722 (11th Cir. 1997)

("A reasonable jury could infer from the quantity of drugs seized that a 'prudent

smuggler' is not likely to entrust such valuable cargo to an innocent person without that

person's knowledge.").  In addition, Connolly saw Nuckles observing this transaction

because he saw Nuckles looking out of the convenience store and almost immediately

thereafter observed the Taurus's lights blink as if the doors were locked remotely.[17]

Moreover, when he first advised Nuckles of his observations, Nuckles became

extremely nervous but did not acknowledge or deny the presence of the suitcase in the

---

[17]    In the event the District Judge concludes that Nuckles was seized under the Fourth Amendment the moment Connolly asked to speak with him, these facts also amount to reasonable suspicion.

27

Taurus.   Instead, he walked away and back into the convenience store.[18]   Thus, Connolly had reasonable suspicion to detain Nuckles.

Nor was the detention transformed into a *de facto* arrest before Nuckles was formally arrested.  First, the purpose of the detention was lawful.  Connolly reasonably suspected that Nuckles was involved in narcotics trafficking.   Second, Connolly diligently performed his investigation in order to either confirm or dispel his suspicions. Even before Connolly initially confronted Nuckles, he called for backup.   Upon approaching Nuckles, he told him the basis for his suspicions based on his observations. This encounter was very brief, amounting to less than one minute before Nuckles began to walk away.  VSV 10:09:47-10:10:13.  Any delay in conducting the investigation before Connolly asked for consent was caused, first, by Nuckles's walking away, and second, by awaiting the arrival of backup.  Any delay caused by Nuckles's walking away cannot be attributed to Connolly's lack of diligence.  Also, any delay that may have been caused by waiting for backup, particularly after Connolly discovered that

---

[18]     The Court acknowledges that Nuckles's presence in an area known to be used for drug trafficking and his nervous demeanor are not sufficient, either separately or together, to raise an objectively reasonable suspicion that warrants further detention. *See United States v. Perkins*, 348 F.3d 965, 971 (11th Cir. 2003); *United States v. Ballard*, 573 F.2d 913, 916 (5th Cir. 1978).  There were sufficient additional reasons stated in the text that, when considered in their totality, adequately give rise to reasonable suspicion.

Nuckles had a firearm in the vehicle, was reasonable. *United States v. Lester*, 477 Fed. Appx. 697, 701 (11th Cir. June 17, 2012) (noting that the only delay in the investigation was the five to ten minutes that it took for backup to arrive, and noting that the wait was reasonable to ensure officer safety) (citing *Long*, 463 U.S. at 1052 ("[W]e have not required that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter.").  Finally, Connolly's asking for consent "was designed to lead to a quick and non-intrusive resolution of the officer['s] reasonable suspicions," and thus this factor weighs in favor of the legality of the stop. *Acosta*, 363 F.3d at 1146.  The record evidence shows that Connolly asked for and received consent to search within five minutes of first encountering Nuckles (i.e., between the first encounter, VSV 10:09:47, and when Connolly asked Nuckles to take his hands out of his pockets, because this request occurred after Connolly received consent and called 911 for uniformed backup. *See* VSV 10:14:04-10:14:29.).

Third, the detention was not intrusive nor was its scope unreasonable for the purpose of the investigation.  Even assuming that Nuckles was seized at the time Connolly initially approached him, as noted, Connolly did not physically interfere with Nuckles's entry into his vehicle at the time.  In fact, in this first phase of the investigation, Nuckles was able to re-enter the convenience store.  In addition,

Connolly did not search, handcuff, or use physical force against Nuckles until he was formally placed under arrest.  He did not ask for or obtain Nuckles's identification, nor did he obtain the keys to the Taurus until the tail-end of the detention.   All of Connolly's requests were in the form of questions as opposed to directives, and occurred in a public place, at times within feet of other gas station patrons.  The undisputed evidence is that Connolly asked Nuckles if he was armed and asked him if he could frisk him, and Nuckles did not hesitate in allowing the frisk, in fact raising his hands to facilitate the pat-down.  Moreover, Connolly was justified in performing the pat-down in the circumstances of this case, since he suspected Nuckles of being involved in a large drug transaction.  *See United States v. Knight*, 562 F.3d 1314, 1327 (11th Cir. 2009) (concluding that smelling marijuana and alcohol during traffic stop contributed to officer's reasonable belief that suspect posed safety threat, which justified pat-down search); *United States v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989) (because detective had reasonable suspicion to stop person suspected of being involved in narcotics trafficking, he had the right to make a limited protective search for concealed weapons, to include a search of the suspect's purse); *United States v. Martin*, 794 F.2d 1531, 1533 (11th Cir. 1986) (recognizing that "weapons in effect are 'tools of the trade' in drug trafficking"); *see also United States v. Packer*, 375 Fed. Appx. 976,

980 (11th Cir. Apr. 23, 2010) (concluding pat-down search was justified by factors that

included the suspect's likely recent involvement in a drug transaction and the officer's

conclusion that his safety was at risk because "based on his experience, people who

trafficked in drugs also carried weapons"); *United States v. Bentley*,

151 Fed. Appx. 824, 830 (11th Cir. Sept. 23, 2005) (finding suspect's known

involvement in drug transactions contributed to officers' reasonable belief that he posed

a safety threat such that pat-down search was warranted). *Accord United States v.

Young*, 277 Fed. Appx. 587, 589-90 (6th Cir. May 8, 2008) (finding officer's reasonable

suspicion that the suspect was attempting to sell drugs sufficient to justify the frisk of

the suspect); *United States v. Garcia*, 496 F.3d 495, 505 (6th Cir. 2007) (concluding that

a pat-down was reasonable when "the officers reasonably suspected the [suspects] of

drug trafficking"); *United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006)

(individual's involvement with drug transactions or distribution can support reasonable

suspicion to frisk that individual for weapons); *United States v. Bustos-Torres*, 396 F.3d

935, 943 (8th Cir. 2005) (because weapons and violence are frequently associated with

drug transactions, it is reasonable for an officer to believe that a person may be armed

and dangerous when the person is suspected of being involved in drug transaction);

*United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) (observing that officers who

stop a person who is "reasonably suspected of carrying drugs" are "entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions"); *United States v. Cannon*, 29 F.3d 472, 476-77 (9th Cir. 1994) (holding that officer could pat down drug suspect stopped late at night in a secluded area known for drug trafficking, concluding that officer "reasonably performed a pat-down search for his own protection").

Similarly, the detention was not rendered intrusive by Connolly's asking for consent to search because an officer may ask for consent to search during a *Terry* stop. *Acosta*, 363 F.3d at 1346. *Cf. United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) (holding that an officer may briefly detain a suspect based upon reasonable suspicion, after giving him a warning ticket, to ask for consent to search his car). Further, the detention was not rendered intrusive or beyond its reasonable scope when Connolly asked Nuckles not to re-enter his vehicle once Nuckles admitted it contained a firearm, particularly in light of Connolly being alone. If, consistent with a *Terry* stop, Connolly was authorized to frisk Nuckles to determine whether he was armed, he certainly did not run afoul of a *Terry* stop's limitations by not allowing Nuckles to gain access to the firearm in the Taurus. Moreover, even if Connolly directed Nuckles to walk away from the Taurus and sit on the curb while waiting for

32

backup to arrive, such directions were reasonable given that Connolly was alone and suspected that Nuckles was involved in narcotics trafficking, Nuckles admitted he had a firearm in the Taurus and he still possessed the keys to the vehicle, Nuckles had put his hands in his pockets and kept pacing in the gas station parking lot, and Connolly was aware that Nuckles's suspected coconspirator had left the scene only moments before.

Finally, the duration of the detention strongly points to a conclusion that the detention was reasonable and not transformed into a *de facto* arrest.  The entire encounter between the time Connolly first approached Nuckles and the suitcase was opened was less than twelve minutes.  VSV 10:09:47-10:20-52.  The Eleventh Circuit has held that a "detention of fourteen minutes is certainly not unreasonable on its face." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001).  A detention of twelve minutes, therefore, does not transform a valid *Terry* detention into a custodial arrest.

Thus, the Court concludes that at the time Connolly asked for and received consent to search the suitcase in the Taurus, Nuckles was validly detained pursuant to *Terry* and was not in custody.

### 2.     *Nuckles was not entitled to* **Miranda** *warnings, and his statements were otherwise voluntary*

Nuckles does not argue in his post-evidentiary hearing brief that his statements were not voluntary, [*see generally* Doc. 6], and therefore has abandoned the argument that the statements were involuntary. *United States v. Carter*, --- F.3d ----, ----, 2015 WL 331088, at *13 (11th Cir. Jan. 27, 2015) (argument not raised in brief is deemed abandoned); *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (holding that a party abandons claims that he does not argue in his brief). *Cf. Thomas v. Bed Bath & Beyond, Inc.*, 508 F. Supp. 2d 1264, 1285 (N.D. Ga. 2007) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (explaining that when a party fails to address a claim in a responsive brief, the claim has been abandoned)).

Even if he did not intend to abandon the contentions made in his opening motion, [*see* Doc. 16 at 6-7], the Court rejects them. In that motion, he contended that he was in custody and thus was entitled to *Miranda* warnings and that his statements were not voluntary. As for the first argument, Nuckles bore the burden of establishing that he was subjected to custodial interrogation, *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978) (holding that "if a defendant shows that a confession was obtained

34

while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination."); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984), *overruled on other grounds, United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988). He did not satisfy that burden.

Even if the burden on this issue was the government's, the record establishes that Nuckles was not in custody and therefore not entitled to *Miranda* warnings. Notwithstanding the absence of a formal arrest, advice of *Miranda* rights is required if there is a restraint on freedom of movement "of the degree associated with a formal arrest." *Minnesota v. Murphy,* 465 U.S. 420, 430 (1984); *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000). The test is objective; "[t]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984). This test "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994); *see also United States v. Phillips,* 812 F.2d 1355, 1360 (11th Cir. 1987) (holding that courts are to consider the totality of the circumstances). The fact that an investigation has focused on a suspect does not necessarily trigger the

35

need for *Miranda* warnings. *Id.* "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person." *United States v. Moya,* 74 F.3d 1117, 1119 (11th Cir. 1996) (emphasis added). The defendant's status as a suspect in the investigation and the "coercive environment" that exists in virtually every interview by a police officer of a crime suspect do not automatically create a custodial situation. *See Muegge*, *id.* (civilian employee of military appeared at interview at military investigators' offices; not custodial); *Phillips*, 812 F.2d at 1360-61 (interview of suspect by police officers in station not custodial).

In the present case, Connolly did not subject Nuckles to a restraint on his freedom of movement to a degree associated with a formal arrest such that a reasonable innocent person would feel he was not free to leave. Although during the course of the encounter before the suitcase was opened Nuckles was frisked twice, asked not to re-enter his vehicle, told to remove his hands from his pockets, told to stand away from the Taurus, and apparently told to sit on the curb, these actions do not amount to a restraint on his freedom of movement to a degree associated with a formal arrest. He was not subjected to an invasive search of his person. Until moments before the suitcase was opened, he retained possession of his car keys. His path was not physically blocked. He was not handcuffed or forced to the ground. No weapons were

36

brandished.  He was not compelled to change locations.  The entire encounter was brief.

During the first part of the encounter that Nuckles contends was custodial, he was able

to enter the convenience store unaccosted and buy lottery tickets.  It also is significant

to the Court that Nuckles was asked not to enter his vehicle after he told Connolly that

a firearm was in the Taurus, but that the directive was not given until after Nuckles

consented to a search of the Taurus.  In any event, being told not to enter a vehicle that

contained a gun until other officers arrived is hardly the type of restraint associated with

a formal arrest.  Thus, Nuckles was not in custody, and therefore he was not entitled to

*Miranda* warnings.

Moreover, his statements were voluntary.  The focus of the voluntariness inquiry

is on whether the defendant was coerced by the government into making the statement:

"The relinquishment of the right must have been voluntary in the sense that it was the

product of a free and deliberate choice rather than intimidation, coercion or deception."

*Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation omitted).  The Court must

consider the totality of the circumstances in assessing whether police conduct was

"causally related" to the confession.   *Miller v. Dugger*, 838 F.2d 1530, 1536

(11th Cir. 1988).  This totality-of-the-circumstances test directs the Court ultimately to

determine whether a defendant's statement was the product of "an essentially free and

unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).

Among the factors the Court must consider are the defendant's intelligence, the length

of his detention, the nature of the interrogation, the use of any physical force against

him, or the use of any promises or inducements by police.  *See*, *e.g.*, *Schneckloth v.*

*Bustamonte,* 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828

(11th Cir. 1996).  However, while the Eleventh Circuit has "enumerated a number of

(non-exclusive) factors that may bear on the issue of voluntariness, . . . the absence of

official coercion is a *sine qua non* of effective consent . . . ."  *Gonzalez*, 71 F.3d at 828

(citations omitted).  Sufficiently coercive conduct normally involves subjecting the

accused to an exhaustingly long interrogation, the application of physical force or the

threat to do so, or the making of a promise that induces a confession.  *See Connelly*,

479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*,

729 F.2d 1360, 1362-63 (11th Cir. 1984).

     Here, the record shows that Nuckles was intelligent, since he understood

Connolly's questions and owned his own car dealership.  His detention was very brief,

as was the non-custodial questioning.  Other than being patted down, no physical force

was employed against him.  Even when the additional officers came on the scene and

he was again frisked, the officers did not accost him, brandish weapons, or subject him

to lengthy questioning.  Finally, the record is silent as to any promises or inducements by police.  Thus, his statements were voluntary.

### 3.     *Nuckles abandoned his interest in the search of the suitcase*

Before turning to the circumstances surrounding the search of the suitcase, the Court must decide whether the government's argument is correct that Nuckles abandoned any interest in the suitcase by stating that it was not his.  Generally, an individual enjoys a reasonable expectation of privacy in personal luggage.  *See United States v. McKennon*, 814 F.2d 1539, 1544 (11th Cir. 1987) (citing *United States v. Place*, 462 U.S. 696, 707 (1983)).  However, an individual who abandons or denies ownership of personal property may not contest the constitutionality of its subsequent acquisition by the police.  *United States v. Cofield*, 272 F.3d 1303, 1306 (11th Cir. 2001); *United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994); *United States v. Hawkins*, 681 F.2d 1343, 1345 (11th Cir. 1982).  In determining whether there has been abandonment, the " 'critical inquiry is whether the person prejudiced by the search . . . voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.' "  *Ramos*, 12 F.3d at 1022 (quoting *United States v. Winchester*, 916 F.2d 601, 603 (11th Cir. 1990)).  Whether

39

abandonment has occurred is a question of intent that may be inferred from acts, words and "other objective facts." *United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982). While the individual whose property was searched bears the burden of proving a legitimate expectation of privacy in the items searched, the burden of proving abandonment is on the government. *See Ramos*, 12 F.3d at 1023.

Here, on three occasions (T1:15-16, 16, 19), Nuckles denied ownership or knowledge of the suitcase that the unidentified male had placed in the back seat of his vehicle. The government adequately placed Nuckles on notice that it challenged his standing[19] by raising the issue in an opening statement before the Court began to receive evidence. T1:3. While Nuckles took efforts earlier to secure the suitcase by remotely locking the vehicle once the suitcase was placed inside, that is not sufficient to establish that he did not abandon his interest in the suitcase as opposed to the vehicle.

As a result, the Court concludes that Nuckles abandoned any interest in the suitcase by repeatedly stating it was not his.

---

[19]   The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing." *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978); *see also Hawkins*, 681 F.2d at 1344-45. However, the undersigned will use the word "standing" when referring to whether the defendant has an expectation of privacy because the parties have used this term and courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim." *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

40

### 4. *Nuckles voluntarily consented to the search of the suitcase*

Even if Nuckles did not abandon a Fourth Amendment interest in the suitcase, he voluntarily consented to its search. "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). In considering whether a consent to search was voluntary, the Court must examine the totality of the circumstances. *United States v. Tovar-Rico*, 61 F.3d 1529, 1535 (11th Cir. 1995); *see also United States v. Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in a totality-of-the-circumstances inquiry). Further, " '[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.' " *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (quoting *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)). The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Gonzalez*, 71 F.3d at 828 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)); *see also Bostick*, 501 U.S. at 438 (" 'Consent' that is the product of official intimidation . . . is not consent at all.").

41

The Eleventh Circuit has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary:  voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.   *Blake*, 888 F.2d at 798-99.  The failure to advise the defendant of his right to refuse to consent will not invalidate an otherwise valid consent to search.  *United States v. Pineiro*, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004); *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999).  None of these factors is controlling.  *United States v. Phillips*, 664 F.2d 971, 1023-24 (5th Cir. 1981); *accord United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984).

The government has the burden of showing, by a preponderance of the evidence, both that there was consent to search and that the consent was voluntary.  *Pineiro*, 389 F.3d at 1366.  Although the preponderance standard is not as difficult to meet as the reasonable-doubt or clear-and-convincing standard, it "is not toothless," and the government must meet its burden with "reliable and specific evidence."   *Cusick*,

559 Fed. Appx. at 792 (quoting *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995)).

Here, the consent was voluntary.  As noted, when he was asked to consent, Nuckles was legitimately detained but not in custody.  The request for consent came within four to five minutes of Connolly first encountering Nuckles and within a minutes after Nuckles exited the convenience store a second time.  Although he was frisked just before he was asked to consent, the frisk was brief, and was preceded both by Connolly asking to frisk him and Nuckles appearing to voluntarily raise his hands to facilitate the frisk.  Connolly employed no coercive procedures to get Nuckles to consent.  Nuckles also was cooperative in that he walked over to Connolly when Connolly first approached him, and stated on three occasions that the vehicle and the suitcase could be searched because he did not own the suitcase.  The conditions of his detention were not made more coercive by the appearance of additional officers, even if some were uniformed and the first two task-force officers arrived with their police lights flashing.  None of them brandished weapons, handcuffed Nuckles, or physically detained him.  He was briefly re-frisked.  Although Connolly did not need again to seek his consent to search the suitcase, the circumstances of Nuckles's detention did not materially

43

change upon the arrival of additional officers to render coercive  the additional request for consent.

Further, although Nuckles was not advised of his right to refuse consent, that failure is just one factor for the Court to consider.  The Court affords this factor less weight due to Nuckles's repeated denials of ownership of the suitcase, since one is less likely to be concerned about a search of property in which he claims he has no ownership interest.  Further, as previously noted, although there is no evidence as to Nuckles's educational level, the record supports a finding that he was intelligent based on his employment and the manner in which he interacted with the agents.

Finally, the last factor—whether Nuckles thought anything incriminating would be found—cuts both ways under the facts of this case, and it is therefore a neutral factor.  On the one hand, if Nuckles was complicit in the transfer of the cocaine-laden suitcase, then he clearly would have expected incriminating evidence to be located inside if he allowed it to be searched.  On the other hand, if, as he claimed, he did not own the suitcase and had no knowledge of it or its contents, then he more likely voluntarily consented because he believed he had nothing to hide.  *United States v. Hall*, 565 F.2d 917, 920 (5th Cir. 1978).

44

In conclusion, the record is devoid of any evidence that Nuckles's consent was the product of any coercive conduct by Connolly or the other officers.  As a result, the undersigned concludes that Nuckles voluntarily consented to a search of the suitcase.

### 5.   *The scope of Nuckles's consent was not exceeded by breaking the lock on the suitcase*

A search is impermissible when an officer does not conform to the limitations imposed by the person giving consent.  *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999); *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990); *see also United States v. Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992) (holding that consensual search is confined to the terms of actual consent given).  When an individual provides a general consent to search, without expressly limiting the terms of his consent, the search "is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass."  *Strickland*, 902 F.2d at 941; *see also Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent . . . is that of 'objective' reasonableness - - what would the typical reasonable person have understood by the exchange between the officer and the suspect?").  To ascertain what conduct is within the "bounds of reasonableness," the Court must consider what the parties knew to be the object (or

45

objects) of the search.  See *Jimeno*, 500 U.S. at 251; *Martinez*, 949 F.2d at 1119. However, a general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items.  *Martinez*, 949 F.2d at 1120.  In this case, Nuckles was asked twice and gave permission to "search your car to see what's in the suitcase."  T1:16, 19-20.

The instant case is controlled by *Martinez*.  In that case, Martinez signed a written consent authorizing the agents to search a mini-warehouse unit.  The officers went to the mini-warehouse unit and cut off the lock.  Inside, they found a 1949 Dodge coupe surrounded by cardboard boxes. After a search of the boxes revealed no contraband, the officers began searching the passenger compartment of the automobile. Tilting the seat forward, the officers removed a board separating the passenger compartment from the trunk.  A perforated metal plate continued to separate the passenger compartment from the trunk.  A detective peered through the plate and into the trunk with the aid of a flashlight.  He identified a cardboard box and a case for a triple-beam scale. Using a piece of wire, he overturned the box, finding that it contained brick-sized packages.  The officers then pried open the trunk.  Inside they found four individually wrapped kilograms of cocaine and a triple-beam scale. 949 F.2d at 1118.

On appeal, Martinez challenged the scope of her consent.  The Eleventh Circuit noted that permission to search a specific area for narcotics may be construed as permission to search any compartment or container within the specified area where narcotics may be found.  *Martinez*, 949 F.2d at 1119 (citing *Jimeno*, 500 U.S. at 251; *Harris*, 928 F.2d at 1118).  On the other hand, general permission to search does not include permission to inflict intentional damage to the places or things to be searched.  *Id.* at 1119-20 (citing *United States v. Strickland*, 902 F.2d 937, 941-42 (11th Cir. 1990), 902 F.2d at 941-42 (defendant's permission to search automobile for contraband could not reasonably be construed to include permission to slash spare tire)).  The *Martinez* court then went on to discuss whether permission to search an area where narcotics may be found extends to forced entry into locked containers located within that area:

> In this case, Martinez understood that the officers wanted to search the mini-warehouse unit for narcotics.  Under the reasonableness inquiry, her permission to search the mini-warehouse could be construed as permission to search any compartment or container therein that might reasonably contain narcotics, including the 1949 Dodge.  The difficulty in this case arises because the trunk of the car was locked.  To positively identify and remove the items in the trunk, the police had to pry it open.  Martinez argues that breaking the trunk lock exceeded the scope of her consent to the search, just as slashing the spare tire in *Strickland* was held to exceed the scope of the consent in that case.
>
> As noted above, the limits of a consensual search are defined by the terms of the consent in the same way that the scope of a warrant search is

47

defined by the specifications of the warrant.  *Strickland*, 902 F.2d at 941; *Blake*, 888 F.2d at 798.  Where a warrant has been issued, "a lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820-21[ ] (1982) (footnote omitted). This court has held that a warrant to search a specific area for a certain class of things authorizes government agents to break open locked containers which may contain the objects of the search.  *See United States v. Gonzalez*, 940 F.2d 1413, 1420 (11th Cir. 1991) (valid warrant to search defendant's house for documents and currency authorized police to search locked briefcase found in house); *United States v. Morris*, 647 F.2d 568, 572-73 (5th Cir. Unit B 1981) (valid warrant to search defendant's home for proceeds of bank robbery authorized search of locked jewelry box). These cases interpreting search warrants apply with equal force to the interpretation of general consents to search.  Thus, we hold that a general consent to search a specific area for specific things includes consent to open locked containers that may contain the objects of the search, in the same manner that such locked containers would be subject to search pursuant to a valid warrant.  In this case, the locked trunk was within the scope of Martinez's consent because it was within the area authorized to be searched, and it was reasonably capable of containing the object of the search.

*Martinez*, 949 F.2d at 1120 (footnote omitted).  The court concluded that forcing open locked compartments or containers has been held to be within the scope of general warrant searches and consent searches.  *Id.* at 1121 (citing *Gonzalez*, 940 F.2d at 1420; *United States v. Milian-Rodriguez*, 759 F.2d 1558, 1563-64 (11th Cir. 1985); *Morris*, 647 F.2d at 572-73).  It recognized that none of those cases appeared to have turned on the damage, or lack of it, inflicted in opening the locked container or compartment.  *Id.*

48

Therefore, the *Martinez* court concluded that the search in that case which resulted in breaking the lock on the trunk of the automobile was included within the consent given.

In the present case, Nuckles consented to the search of the suitcase.  That consent necessarily included breaking the lock on the suitcase so that its contents could be examined.  The actions of the agents was made ever more reasonable because they first attempted to determine if Nuckles (who disclaimed ownership of the suitcase) had a key that unlocked the suitcase lock.

As a result, the Court concludes that breaking the lock on the suitcase to expose its contents was within the scope of the search of the suitcase to which Nuckles twice consented.

### 6.     The Taurus could be searched for the firearm and magazine

Finally, the Taurus was permissibly searched, and the firearm and magazine were lawfully seized.  Initially, however, the Court concludes that a search of the Taurus was not necessarily within the scope of the consent given, because, as noted, the consent was to "search[] your car to see what's in the suitcase."  T1:16.  A general search of the Taurus then is outside the scope of the consent.

On the other hand, the vehicle was validly searched because there was probable cause to believe it contained contraband and evidence of a crime.  In *Carroll v. United*

49

*States*, 267 U.S. 132, 153 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles.  Under the "automobile exception,"[20] "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."  *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996).  No separate exigent circumstances need to be shown.  *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999).  The validity of the search turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime.  *Id.*

Probable cause for a search exists when under the totality of the circumstances "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002).

---

[20]    The term "automobile exception" is somewhat of a misnomer, since the Supreme Court has expressly stated that there is "no general 'automobile exception' to the warrant requirement."  *South Dakota v. Opperman*, 428 U.S. 364, 382 (1976).  Rather, this term-of-art is better understood as simply embracing the now-settled doctrine that it is permissible to conduct a warrantless search of an automobile and any containers found therein, provided that, at the time of the search, there is probable cause to believe that contraband is secreted at some unspecified location within the automobile.  *California v. Acevedo*, 500 U.S. 565 (1992); *United States v. Ross*, 456 U.S. 798 (1982).  Of course, if the police have probable cause to believe that contraband is located in a specific area of the automobile, then a warrantless search of the entire automobile is impermissible.  *See Arkansas v. Sanders*, 442 U.S. 753 (1979).

50

In the present case, the law enforcement officers had probable cause to believe that the Taurus contained contraband and evidence of the crime because Nuckles told Connolly that there was a firearm inside the vehicle.  Since there was probable cause to believe that Nuckles possessed with intent to distribute a large quantity of cocaine, there was probable cause to seize the firearm and ammunition as being possessed in furtherance of the drug trafficking crime.  18 U.S.C. § 924(c).

Moreover, to the extent that the vehicle was searched beyond locating the firearm and magazine, the vehicle search was incident to Nuckles's lawful arrest.  In *Arizona v. Gant*, 556 U.S. 332, 351 (2009), the Supreme Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."  Here, having arrested Nuckles for having received a large quantity of cocaine and based on his statement that there was a firearm inside the vehicle, the officer had reason to believe (or probable cause to believe, if "reason to believe" is not synonymous with "probable cause) that the Taurus contained evidence of the offense of arrest—that is, drug trafficking.

51

*Conclusion*

For all of the foregoing reasons, the undersigned **RECOMMENDS** that Nuckles's motion to suppress evidence and statements, [Doc. 16], be **DENIED**. The Court has now ruled on all matters referred to it and has not been advised of any impediment to the setting of a trial date. Accordingly, this matter is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED and CERTIFIED**, this   18th   day of February, 2015.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

52