FILED IN CHAMBERS
U.S.D.C. - Atlanta

APR 07 2015

James H. Hatten, Clerk
By: AmCauer

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

RICKY NUCKLES

CRIMINAL CASE NO.

1:14-CR-218-ODE-AJB

## ORDER

This criminal case is before the Court on Ricky Nuckles' ("Defendant") objections [Doc. 40] to the Final Report and Recommendation ("R&R") [Doc. 33] of United States Magistrate Judge Alan J. Baverman.  The R&R recommends that Defendant's Motion to Suppress be denied [Id. at 1].   For the following reasons, Defendant's objections [Doc. 40] are OVERRULED, and the R&R [Doc. 33] is ADOPTED IN ITS ENTIRETY.  Accordingly, Defendant's Motion to Suppress [Doc. 16] is DENIED.

## I.  **Background**

Defendant is charged in a two-count indictment with possession with intent to distribute more than five kilograms of cocaine and possession of a firearm in furtherance of that offense [Indictment, Doc. 1].   On June 25, 2014, Defendant moved to suppress evidence found during the search of a vehicle and suitcase contained therein and statements he made during his encounter with law enforcement on December 23, 2013 [Doc. 16]. Judge Baverman held two evidentiary hearings regarding Defendant's motion to suppress, one on August 4, 2014 ("Hearing 1") [Doc. 19] and the other on October 22, 2014 ("Hearing 2") [Doc. 25].  Both parties also filed briefs after the hearings [Docs. 27, 29].

### A.    Facts

The facts below are taken from Judge Baverman's R&R [Doc. 33].

Michael Connolly ("Connolly") has been a DEA agent for over five years, and before becoming a DEA agent, spent six years as a Massachusetts police officer [Hearing 1 Tr., Doc. 22 at 5].   He has been involved in approximately fifty drug investigations [Id.].   He testified that based on his experience, he is able to recognize drug transactions, including larger transactions commonly involving exchanges between separate vehicles in locations such as gas stations and parking lots [Id. at 6, 37].

On December 23, 2013, at approximately 10:00 a.m., Connolly was off-duty and went to the Valero gas station[1] on Cheshire Bridge Road[2] to have his annual emission inspection performed [Id. at 7, 10, 15].   Connolly was dressed in plain clothes and had his weapon secreted in an ankle holster [Id. at 8].

When Connolly arrived at the emission-inspection station, there was a wait for inspections, so he cleaned out the trash from his car [Id. at 7-8].   He noticed a black Ford Taurus with a red dealer tag parked at the gas pumps, but gasoline was not being

---

[1] A copy of the security video at the gas station has been obtained and is part of the record in this case.   The Court will refer to this security video as "VSV" and cite to the video using its time-stamps. The VSV is relied upon only to the extent it confirms or contradicts Connolly's testimony about his encounter with Defendant.

[2] Connolly described the area around the gas station as a high drug-trafficking area due to its proximity to I-85 [Hearing 1 Tr., Doc. 22 at 7].

2

pumped into it [Id. at 8, 10, 36].[3]  At approximately 10:05 a.m., Connolly saw a second car, a dark sedan, pull in and stop at the opposite side of the gas pumps [Id. at 8, 38; VSV 10:07:21].  The trunk of the dark sedan opened, and the driver, a black male, exited the vehicle [VSV 10:07:31; Hearing 1 Tr., Doc. 22 at 8, 10, 38].  The male removed a large suitcase from the trunk of the sedan and carried the suitcase over to the trunk of the Taurus [Hearing 1 Tr., Doc. 22 at 8-9].  He attempted to open the trunk of the Taurus, but it would not open [Id.; VSV 10:07:54].  He then looked up at the convenience store of the gas station; Connolly interpreted this as looking for someone in the store that he knew [Hearing 1 Tr., Doc. 22 at 9].  As Connolly walked towards the Taurus on his way to the trash can next to the store, he observed the male from the dark sedan open the Taurus' driver's side back door and place the suitcase inside the Taurus [Id. at 9, 44; VSV 10:08:22].  As Connolly disposed of his trash, he saw Defendant standing inside the convenience store, looking out the window [Hearing 1 Tr., Doc. 22 at 9, 56].  As Connolly walked back to his vehicle, he watched the male close the door to the Taurus, return to the dark sedan, and drive away [Id. at 11, 44].

After the male walked back to his car after depositing the suitcase, Connolly saw the Taurus' lights blink as if the doors were being locked remotely [Id.].  At the time the Taurus' brake lights flashed, Connolly was walking away from the Taurus and was approximately more than a car length behind it [VSV 10:08:19].

---

[3]Connolly was unaware whether gasoline had already been pumped into the Taurus or if the driver had gone inside the store to pay for gasoline [Hearing 1 Tr., Doc. 22 at 37].

3

Connolly called his partner and requested that additional people be sent to his location because he thought, "There's something going on here" [Hearing 1 Tr., Doc. 22 at 11]. Connolly testified that his observations were "exactly consistent" with the drug transactions he witnesses "on a weekly basis" [Id.]. While Connolly was on the phone with his partner, he saw Defendant exit the convenience store and walk towards the driver's door of the Taurus [Id. at 12, 44].

Connolly approached Defendant and took out his DEA badge and displayed it to Defendant [VSV 10:09:47].[4] He identified himself as a DEA agent and asked if he could speak with Defendant; Defendant said yes [Hearing 1 Tr., Doc. 22 at 12].

Connolly asked Defendant if the Taurus was his; Defendant replied that it was [Id.]. When Connolly explained that he had just observed a random male put a suitcase in Defendant's car, Defendant became "extremely nervous," in that he looked "in all directions," his hands were moving around, and "basically he couldn't stand in place" [Id. at 12-13; VSV 10:10:08].[5]

Defendant began to walk away, and Connolly asked if he minded "just hanging out here for a little bit so we can talk," but

---

[4]Connolly did not physically block Defendant's attempt to enter the Taurus, as Defendant walked past the Taurus on the driver's side to meet Connolly, who had stopped approximately a half a car length behind the Taurus [VSV 10:09:47].

[5]Defendant objects that the VSV does not corroborate Connolly's testimony that Defendant was nervous and could not stand in place [Doc. 40 at 4]. Having reviewed the VSV, the Court concludes that it does corroborate Connolly's testimony. Defendant repeatedly waves his arms in the air and takes a couple of aimless steps before turning from Connolly [VSV 10:10:04-16]. Accordingly, Defendant's objection [Doc. 40 at 4] is OVERRULED.

4

Defendant continued to walk away and into the gas station [Hearing 1 Tr., Doc. 22 at 13; VSV 10:10:13-30]. Connolly did not attempt to stop him [Hearing 1 Tr., Doc. 22 at 13].

Connolly watched Defendant, who appeared to be buying lottery tickets inside the store [Id. at 14].[6] When Defendant exited the store approximately one minute later, Connolly re-engaged him by asking if he had any weapons on him, and Defendant replied that he did not [Id.]. Connolly asked if he could do a quick pat-down to make sure he was unarmed, and Defendant responded that he could and raised his arms [Id. at 15; VSV 10:11:56-10:12-05]. Connolly did not find any weapons during the pat-down [Hearing 1 Tr., Doc. 22 at 15].

Connolly and Defendant walked toward the Taurus with about three to four feet between them [Id.].[7] Connolly explained again what he had seen, and Defendant stated that he was inside the gas station and that the bag was not his [Id.]. Connolly acknowledged that Defendant had been in the gas station and tried to "keep the situation at a lower point" because Defendant "was starting to get elevated towards [him]" [Id. at 15-16; see also VSV 10:12:30-10:13:24].[8]

---

[6]There was another door on the opposite side of the convenience store [Hearing 1 Tr., Doc. 22 at 54].

[7]During the conversation that followed, there were other gas-station patrons pumping gas or sitting in their vehicles [VSV 10:13:32].

[8]Defendant objects that the VSV does not corroborate Connolly's testimony that Defendant started to "get elevated" towards him [Doc. 40 at 4]. Having reviewed the footage, the Court disagrees. The footage shows Defendant animatedly throw his arms out to the side multiple times, gesture pointedly at the

5

Connolly asked Defendant, "Would you mind if I searched your car to see what's in the suitcase?" and Defendant replied, "No, I don't care. Go ahead. I told you it's not mine" [Hearing 1 Tr., Doc. 22 at 16].[9] Connolly then received a phone call from one of his DEA group members, who advised that additional officers were on their way [Id.].

After Connolly ended his phone call, Defendant asked him if he could retrieve something from his vehicle [Id.]. Connolly asked him if he had any weapons in the vehicle; Defendant stated that he did [Id.]. Connolly asked if Defendant would mind waiting until Connolly's assistance arrived, and Connolly testified that Defendant was "fine with that" [Id.]. Because he did not know when his assistance would arrive, Connolly then called 911 and told the dispatcher who and where he was and explained that he was with a person with a firearm in his vehicle [Id. at 18].

While Connolly was on the phone, Defendant put his hands in his pockets [Id.; VSV 10:14:04-29]. Once off the phone, Connolly asked Defendant to take his hands out of his pockets [Hearing 1 Tr., Doc. 22 at 18; VSV 10:16:02]. Connolly also asked Defendant to walk over toward the gas station, and Defendant complied [Hearing 1 Tr., Doc. 22 at 19; VSV 10:15:09-11]. Defendant sat on the curb [Hearing 1 Tr., Doc. 22 at 19; VSV 10:15-14-19]. Connolly testified that he did not order him to sit [Hearing 1

---

store, and take a couple of steps towards Connolly, who responds by stepping back [VSV 10:12:30-10:13:24]. Accordingly, Defendant's objection [Doc. 40 at 4] is OVERRULED.

[9]Defendant was never given a written consent-to-search form to review [Hearing 1 Tr., Doc. 22 at 48-49].

Tr., Doc. 22 at 19]. The video shows Connolly motioning to Defendant with his hands, as if to tell him to sit on the curb or to remain where he was [VSV 10:16:08-14].[10]

Three to four minutes after the 911 call ended, Sandy Springs Police Department Detectives Jeff Byrd ("Byrd") and Lerod Freeman ("Freeman"), both DEA Task Force members, arrived at the gas station [Hearing 1 Tr., Doc. 22 at 19, 64-65]. They joined Connolly and Defendant, who was now standing [Id. at 65]. Defendant appeared to be agitated and irritated at the situation [Id. at 66]. Freeman frisked Defendant [VSV 10:18:40].

Connolly asked Defendant for keys to the Taurus because it was still locked [Hearing 1 Tr., Doc. 22 at 18, 60]. Defendant removed the keys from his pocket and unlocked the car [Id. at 18-19; VSV 10:18:29, 42-44]. Connolly asked again if Defendant had an issue with him searching the car to see what was in the suitcase; Defendant again stated that he did not mind and that it was not his suitcase [Hearing 1 Tr., Doc. 22 at 18-19, 66]. Freeman frisked Defendant again [Id. at 20; VSV 10:19:02].

Connolly entered the Taurus, retrieved the suitcase, and placed it on the ground behind the car [Hearing 1 Tr., Doc. 22 at 20; VSV 10:19:11]. Other law enforcement officers arrived on the

---

[10]Defendant objects to the Court's conclusion that the video is inconclusive as to whether Connolly motioned as if instructing Defendant to sit down [Doc. 40 at 4]. Having reviewed the footage, the Court disagrees. Connolly makes two small motions with his hands as if pointing at Defendant [VSV 10:16:08-14]. After the second motion by Connolly, Defendant does sit on the curb [Id.]. However, the Court cannot tell from the video if Connolly is instructing him to sit or merely to stay where he was by the gas station. Therefore, Defendant's objection [Doc. 40 at 4] is OVERRULED.

7

scene, including uniformed City of Atlanta police officers and DEA Task Force Officer Chris Richards ("Richards") [Hearing 1 Tr., Doc. 22 at 19, 48; VSV 10:19:11, 23]. The suitcase had a lock on it, and although Defendant had a key ring with many keys on it, Connolly and Richards popped the lock with a screw driver [Hearing 1 Tr., Doc. 22 at 21-22; Gov't Ex. 3]. Connolly and Richards observed what they believed were twenty-four kilograms of cocaine, which field-tested positive for cocaine [Hearing 1 Tr., Doc. 22 at 22-23; Gov't Ex. 4].

Connolly advised Defendant he was under arrest and handcuffed him; Defendant immediately asked to speak with a lawyer [Hearing 1 Tr., Doc. 22 at 23, 69; Hearing 2 Tr., Doc. 26 at 9]. Defendant was not questioned [Hearing 1 Tr., Doc. 22 at 23].

Byrd entered the Taurus and seized a FN Five-Seven handgun and an ammunition clip in the driver's side door pocket and two cell phones from the center console [Id. at 46, 48; Gov't Ex. 5].[11]

The time elapsed between Connolly's first encounter with Defendant and Defendant's formal arrest was approximately twelve minutes. During the encounter with Defendant, no law enforcement agent unholstered his weapon [Hearing 1 Tr., Doc. 22 at 50-51]. The wholesale value of the cocaine in the suitcase is approximately $750,000 [Id. at 6-7].

## II.  Judge Baverman's Recommendations

Judge Baverman recommended that Defendant's Motion to Suppress Evidence and Statements [Doc. 16] be DENIED [Doc. 33 at

---

[11]An amount of currency and a cell phone were also seized from Defendant after his arrest [Hearing 1 Tr., Doc. 22 at 66, 68-69; Gov't Ex. 6].

8

1].  The R&R concluded that the encounter with Defendant initially began as consensual but became a seizure supported by reasonable suspicion [Id. at 17-28].  However, the R&R also found that the detention was not transformed into a de facto arrest before Defendant was formally arrested, because the purpose of the detention was lawful, the duration and scope of the detention were reasonable, and Connolly diligently performed his investigation [Id. at 28-33].

Regarding Defendant's statements to law enforcement during his detention, the R&R concluded that Defendant had abandoned this issue as he failed to raise it in his response brief [Id. at 34]. However, the R&R determined that, even had Defendant not abandoned that issue, Defendant was not in custody and therefore not entitled to a Miranda warning and any statements by him were voluntarily given [Id. at 34-38].  As to the search of the Taurus and the suitcase, the R&R found that Defendant had abandoned his interest in the suitcase, and thus the search was permissible [Id. at 38-40].[12]

The R&R further concluded that all matters before Judge Baverman had been ruled upon and therefore certified that the action is ready for trial [Id. at 52].

On March 4, 2015, Defendant filed objections to the R&R [Doc. 40].

---

[12]Assuming arguendo that Defendant did not abandon his interest in the suitcase, Judge Baverman also concluded that Defendant voluntarily consented to the search of the suitcase and that the scope of consent was not exceeded when the lock on the suitcase was broken [Doc. 33 at 41-51].

III. **Standard of Review**

Pursuant to 28 U.S.C. § 636(b)(1), the Court must conduct a de novo review of those portions of the R&R to which Defendant objects. The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); <u>United States v. Raddatz</u>, 447 U.S. 667, 673-74 (1980). However, for a party's objections to warrant de novo review, he "must clearly advise the district court and pinpoint the specific findings that [he] disagrees with." <u>United States v. Schultz</u>, 565 F.3d 1353, 1360 (11th Cir. 2009). The remainder of the R&R, to which neither party offers specific objections, will be assessed for clear error only. <u>See</u> <u>Tauber v. Barnhart</u>, 438 F. Supp. 2d 1366, 1373 (N.D. Ga. 2006) (Story, J.).

IV. **Defendant's Objections**

Defendant objects [Doc. 40] essentially to all of Magistrate Judge Baverman's findings with respect to his recommendation that Defendant's Motion to Suppress [Doc. 16] be denied. Defendant relies on the arguments he raised in support of his Motion to Suppress [Doc. 40 at 3; Doc. 16; Doc. 29]. The Court will address each of Defendant's specific objections in turn.

A. *Defendant's Objection That the Purpose of the Detention Was Unlawful*

Judge Baverman concluded that the purpose of Defendant's detention prior to his formal arrest was lawful [Doc. 33 at 28]. Defendant objects to this conclusion, arguing that Connolly observing a vehicle drive up to another at the gas station and watching an unknown male put a suitcase from one vehicle into another did not create reasonable suspicion [Doc. 40 at 4; Doc. 16

10

at 3]. Given that Connolly had no way of knowing if contraband was inside the suitcase and that he observed Defendant purchasing lottery tickets, Connolly had no reason to believe Defendant did not have legitimate reasons for being at the gas station that day [Doc. 29 at 3-4].

"Law enforcement officers may briefly detain a person for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged, or is about to engage, in criminal activity." United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir. 1993) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). The reasonable suspicion required for a Terry stop must be "at least 'some minimal level of objective justification,' taken from the totality of the circumstances." Id. at 1221 (quoting United States v. Sokolow, 490 U.S. 1, 7-8 (1989)).

Connolly had reasonable suspicion that Defendant was engaged in narcotics trafficking when he observed the other driver arrive, place a large suitcase in the Taurus' back seat, and immediately drive away without making contact with Defendant or anyone associated with the Taurus. Further, Connolly observed Defendant watching the other driver place the suitcase in the backseat. Connolly testified that these actions were "exactly consistent" with drug transactions he has observed regularly [Hearing 1 Tr., Doc. 22 at 11]. Defendant also acted nervous when questioned about Connolly's observations. These observations, based on the totality of the circumstances, provided Connolly with the requisite level of objective justification for the Terry detention.

11

Therefore, Defendant's objection [Doc. 40 at 4] is OVERRULED, and the R&R [Doc. 33] is ADOPTED as to its conclusion that the purpose of Defendant's detention was lawful.

### B. *Defendant's Objection That the Detention was Intrusive and Its Scope Unreasonable*

Magistrate Judge Baverman concluded that the scope and level of intrusion of the detention was not unreasonable [Doc. 33 at 29-33]. Defendant objects to this conclusion [Doc. 40 at 4]. Defendant argues that because Connolly prevented him from entering his vehicle, stood outside the door of the convenience store, gestured for Defendant to come back outside, and never informed Defendant that he was free to leave, his freedom of movement was significantly limited and the duration overly long [Doc. 16 at 3-4; Doc. 29 at 4-5]. The Court disagrees.

A temporary investigative detention pursuant to <u>Terry</u> must be "reasonably related in scope to the circumstances which justified the interference in the first place." <u>United States v. Acosta</u>, 363 F.3d 1141, 1145 (11th Cir. 2004) (internal quotation marks and citation omitted). To determine whether the manner and length of a detention are reasonable, the Court weighs the following non-exclusive factors: "'the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.'" <u>United States v. Gil</u>, 204 F.3d 1347, 1351 (11th Cir. 2000) (quoting <u>United States v. Hardy</u>, 855 F.2d 753, 759 (11th Cir. 1998)).

In evaluating the intrusiveness of the detention, the Court asks "whether the scope and intrusiveness of the detention

exceeded the amount reasonably needed by police to ensure their personal safety." Acosta, 363 F.3d at 1146. "While restriction on freedom of movement is a factor to be taken into account in determining whether a person is under arrest, it alone is not sufficient to transform a Terry stop into a de facto arrest." Id. at 1147.

Contrary to Defendant's assertion, Connolly did not block Defendant's access to his car. In fact, Defendant walked past the driver's side door in order to speak with Connolly. Second, even after the encounter with Connolly began, Defendant was able to reenter the convenience store, which had a second exit. Connolly also never used any physical force against Defendant until he was under arrest. Connolly did not retain Defendant's identification or even ask for his car keys until the end of the detention. Additionally, given Connolly's reasonable suspicion that Defendant was involved in a narcotics transaction, it was reasonable for Connolly to ask if Defendant was armed and to frisk him. See id. Additionally, it is undisputed that Defendant consented to the frisk by Connolly.

As to duration, Defendant argues that Connolly's waiting for "backup" unreasonably prolonged the search [Doc. 29 at 5]. However, the entire interaction between Connolly's approach and Defendant's formal arrest lasted approximately twelve minutes. While there is no rigid time limit regarding the permissible duration of a Terry detention, twelve minutes falls firmly within the time periods that have been held reasonable. See, e.g., United States v. Sharpe, 470 U.S. 675, 688 (1985) (finding twenty minutes reasonable); Courson v. McMillian, 939 F.2d 1479, 1492

(11th Cir. 1991) (finding thirty minutes reasonable); Acosta, 363 F.3d at 1147-48 (finding thirty minutes reasonable); Hardy, 855 F.2d at 761 (finding fifty minutes reasonable). Additionally, any delay caused by Connolly awaiting backup was reasonable after Connolly learned that Defendant had a firearm in the vehicle. United States v. Lester, 477 F. App'x 697, 700 (11th Cir. 2012) (holding that five to ten minute delay awaiting backup was reasonable based on defendant's violent criminal history).

Therefore, Defendant's objection [Doc. 40 at 4] is OVERRULED, and the R&R [Doc. 33] is ADOPTED as to its conclusion that Defendant's temporary detention was reasonable in both scope and duration.

### C. Defendant's Objection That His Compliance with Connolly's Request to Frisk Him Did Not Justify the Search

Defendant objects to the R&R's conclusion "that Mr. Nuckles complying with SA Connolly's request to frisk him serves as justification for the search" [Doc. 40 at 4]. While it is not entirely clear from Defendant's objection what Defendant means by "search," the Court reads his objection as pertaining to his pat-down by Connolly. The Court also notes that Defendant's briefs [Docs. 16, 29] do not address this conclusion by the Magistrate Judge.

The Court believes Defendant conflates two separate conclusions by Judge Baverman. Judge Baverman did not conclude that the consent justified the pat-down. Rather, he concluded (1) that Defendant consented to the pat-down by Connolly, and (2) that Connolly was justified in requesting and performing the pat-down given that he had a reasonable suspicion that Defendant was

14

engaged in a large drug transaction [Doc. 33 at 30].   The Court agrees with this assessment.   Therefore, Defendant's objection [Doc. 40 at 4] is OVERRULED.

### D.   *Defendant's Objection That the Detention Was a De Facto Arrest*

Judge Baverman concluded that Defendant's detention did not transform into a de facto arrest before he was formally arrested [Doc. 33 at 28-33].   Defendant objects to this conclusion [Doc. 40 at 4].   In his briefs, Defendant relies only upon his arguments regarding the alleged unlawfulness of the purpose of the detention, its unreasonable scope, and its unreasonable duration to support his contention that the detention became a de facto arrest [Doc. 29 at 3-5; Doc. 16 at 3-4].   Having addressed those arguments above, the Court OVERRULES Defendant's objection [Doc. 40 at 4], and ADOPTS the R&R [Doc. 33] as to its conclusion that Defendant's detention did not become a de facto arrest prior to his formal arrest.

### E.   *Defendant's Objection That He Did Not Abandon His Argument That His Statements Were Not Voluntary*

Judge Baverman deemed abandoned Defendant's arguments that his statements to police were involuntary when he failed to include them in his December 12, 2014 brief [Doc. 33 at 34]. Defendant contends that he did not abandon arguments regarding the voluntariness of his statements because he raised them in his initial motion to suppress [Doc. 16] and at the August 6, 2014 Hearing [Doc. 40 at 5].

At the end of Hearing 2, Judge Baverman ordered the Government to file a brief, to which Defendant could respond and the Government could reply in support [Hearing 2 Tr., Doc. 26 at

13].   The Government filed its brief on November 24, 2014 and argued, inter alia, that Defendant's statements were freely and voluntarily given [Doc. 27 at 11-13].   Defendant did not address this issue in his response [Doc. 29].

A party abandons a claim where he fails to offer an argument on the issue in his brief.   Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).   Therefore, Judge Baverman was entitled to conclude that Defendant had abandoned his argument relating to the voluntariness of his statements when he failed to raise the issue in his response brief [see Doc. 29].   Defendant's objection [Doc. 40 at 5] is OVERRULED, and the R&R [Doc. 33] is ADOPTED as to its conclusion that Defendant abandoned his arguments regarding the voluntary nature of his statements.

### F.   Defendant's Objection That He Was in Custody While Being Questioned

Having assumed arguendo that Defendant had not abandoned his claims regarding the voluntariness of his statements, Judge Baverman concluded that Defendant was not in custody when he was questioned by Connolly [Doc. 33 at 35-37].   Defendant objects to this conclusion [Doc. 40 at 5].   In his brief, Defendant merely states that "the burden is on the Government to prove that the statement has been freely and voluntarily given" [Doc. 16 at 7]. He further states in a conclusory fashion that "Mr. Nuckles' statements were made involuntarily and without being given proper Miranda warnings" [Id.].   This does not specifically address the conclusions by Judge Baverman that Defendant was not in custody while being questioned.   This does not suffice as a specific objection under Federal Rule of Criminal Procedure 59.   See United

16

States v. Diaz, No. 1:09-CR-0037-WBH, 2011 WL 344093, at *1 (N.D. Ga. Jan. 31, 2011) (Hunt, J.) ("General objections which reassert arguments by reference to prior pleadings do not suffice."); Fed. R. Crim. P. 59(a).

This Court has reviewed the R&R for clear error as to this issue and found none.

Therefore, Plaintiff's objection [Doc. 40 at 5] is OVERRULED, and the R&R [Doc. 33] is ADOPTED as to its conclusion that Defendant was not in custody when he was questioned and therefore not entitled to a Miranda warning.

### G. Defendant's Objection That He Had a Reasonable Expectation of Privacy in the Suitcase

Magistrate Judge Baverman concluded that Defendant had abandoned his interest in the suitcase [Doc. 33 at 39-40]. Defendant objects to this conclusion [Doc. 40 at 5]. However, neither of the briefs relied upon by Defendant addresses this issue [Docs. 16, 29]. Defendant offers no arguments in support of his objection. Because Defendant does not specifically address the conclusions by Judge Baverman that he abandoned his interest in the suitcase, he has not put forth a specific objection under Federal Rule of Criminal Procedure 59. See Diaz, 2011 WL 344093, at *1; Fed. R. Crim. P. 59(a).

The Court has reviewed Judge Baverman's conclusion on this issue for clear error and found none.

Therefore, this objection [Doc. 40 at 5] is OVERRULED, and the R&R [Doc. 33] is ADOPTED as to its conclusion that Defendant abandoned his interest in the suitcase by denying ownership of it multiple times.

17

### H.   *Defendant's Objection That He Did Not Consent to a Search of the Luggage*

Assuming arguendo that Defendant did have an interest in the suitcase, Judge Baverman concluded that Defendant voluntarily consented to the search of the car and the suitcase [Doc. 33 at 41-45]. Defendant objects to this conclusion [Doc. 40 at 5]. Defendant argues that because Connolly did not search the vehicle after he first obtained consent but rather asked again for consent while the Defendant was being frisked and was surrounded by additional officers, his consent was not voluntary [Doc. 16 at 5]. Defendant also points out that he was never informed of his right to refuse consent [Doc. 29 at 6].

The Government bears the burden of showing that consent was freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548 (1968). In considering whether a consent to search is voluntary, the Court must look to the totality of the circumstances. United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995). Factors relevant to a determination of whether consent for a warrantless search was voluntary include:

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989)(internal quotation marks and citation omitted).

Here, Defendant was not in custody either the first or second time he gave consent to search his car. No officer brandished weapons at Defendant or physically detained him. Defendant had

18

been cooperating fully with police up to and including his consent to the search of the car: he consented to a frisk, he complied with Connolly's request to remove his hands from his pockets, he also complied with Connolly's request to remain near the entrance to the convenience store. And while Defendant was not apprised of his right to refuse consent, a failure to inform him of that right does not render the consent involuntary where there is no other coercive behavior on the part of the officers. United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999).

Therefore, the Court concludes that Connolly and the other officers did not engage in coercive behavior and that Defendant's consent to search the car was given voluntarily. Accordingly, Defendant's objection to the contrary [Doc. 40 at 5] is OVERRULED, and the R&R [Doc. 33] is ADOPTED as to this issue.

I.    **Defendant's Objection That the Scope of the Consent was Exceeded By Breaking the Lock on the Luggage**

Defendant contends that the scope of his consent was exceeded when the officers broke the lock on the closed suitcase [Doc. 40 at 5; Doc. 16 at 5-6; Doc. 29 at 6-7].

"When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." United States v. Street, 472 F.3d 1298, 1308 (11th Cir. 2006). "The scope of a search is generally defined by its expressed object." Florida v. Jimeno, 500 U.S. 248, 251 (1991).

19

Here, Connolly repeatedly asked for and received consent to "search[] [Defendant's] car to see what's in the suitcase" [Hearing 1 Tr., Doc. 22 at 16]. Therefore, Connolly clearly communicated to Defendant that the objective of the search was to see what was contained in the suitcase. Additionally, permission to search a specific area may permissibly be construed as permission to search any container within the specified area where narcotics may be found. United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992). Further, "a general consent to search a specific area for specific things includes consent to open locked containers that may contain the objects of the search, in the same manner that such locked containers would be subject to search pursuant to a valid warrant." Id. at 1120 (footnote omitted). The suitcase was a container in the Taurus' backseat of a size in which narcotics may be found. Under Martinez, the general consent by Defendant to search the car included the consent to open the locked suitcase that may have contained objects of their search. Therefore, the breaking of the lock was within the scope of the consent of the search of the backseat and the suitcase.

Accordingly, Defendant's objection [Doc. 40 at 5] is OVERRULED, and the R&R [Doc. 33] is ADOPTED as to its conclusion that the breaking of the suitcase lock did not exceed the scope of consent for the search.

## IV.  Conclusion

For the reasons set forth above, Defendant's objections [Doc. 40] are OVERRULED, and the R&R [Doc. 33] is ADOPTED IN ITS ENTIRETY. Accordingly, Defendant's Motion to Suppress [Doc. 16] is DENIED.

SO ORDERED this ___6___ day of April, 2015.


ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE